# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 17-CV-645 (JFB)

———————————————

MARK J. RIDGE,

Plaintiff,

VERSUS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

——————————

**MEMORANDUM AND ORDER**
March 30, 2018

——————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Mark Ridge ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act on February 3, 2017, challenging the final decision of the Acting Commissioner of Social Security (the "Commissioner" or the "government") denying plaintiff's application for Social Security disability benefits on December 12, 2016. An Administrative Law Judge ("ALJ") determined that plaintiff had the residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b), with certain limitations. The ALJ found that there were a significant number of jobs in the national economy that plaintiff could perform despite these limitations, and, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes the motion and cross-moves for judgment on the pleadings. For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case to the Administrative Law Judge ("ALJ") for further proceedings consistent with this Memorandum and Order.

## I. FACTUAL BACKGROUND

The following summary of the relevant facts is based upon the administrative record ("AR") developed by the ALJ. (ECF No. 7.) A more exhaustive recitation is contained in the parties' submissions to the Court and is not repeated herein.

### A. Personal and Work History

Plaintiff was born on December 31, 1967, and is currently 50 years old. (AR at 164.) Plaintiff is divorced and has three teenage children who live with their mother. (AR at 41.) Plaintiff lives with his parents. (AR at 43.) He completed one or two years of college. (AR at 168, 214.)

Prior to becoming unable to work, plaintiff worked as a correction officer for the Nassau County Sheriff's Department from August 1995 through January 2013. (AR at 214.) Plaintiff was injured at work on January 6, 2011, when an inmate fell on him while he was attempting to stop a fight. (AR at 368.) The incident resulted in injuries to plaintiff's hip, shoulder, and back (AR at 279, 368), and plaintiff received Workers' Compensation as a result of this injury from January 2011 to February 2012 (AR at 133, 136, 139). Plaintiff returned to work "in a light duty capacity" from February 2012 through January 2013, when he retired on disability pension. (AR at 44-45, 399.) At plaintiff's hearing before the ALJ in this case, he testified that he sustained injuries to his neck "from numerous inmate altercations, assaults . . . throughout [his career]," and that his neck pain got worse after a motor vehicle accident in 2014. (AR at 45.)

Plaintiff claimed that his disability onset date was July 4, 2012. (AR at 129.) At his

hearing before the ALJ, he claimed that he was disabled because he was "limited to a less-than sedentary occupational life." (AR at 36-37.) In a function report dated June 5, 2013, plaintiff reported that he did not need help taking care of his personal needs and grooming, could fix light meals, although he used to cook more "before [his] conditions began," and was able to do some light cleaning in the house. (AR at 221-22.) He stated that he needed help with all chores, and could no longer do outdoor chores. (AR at 222.) Plaintiff reported that he went outside daily, drove a car, and shopped for personal items and groceries about once a week. (AR at 222-23.) He stated, however, that he could not go to the gym, lift weights, or ride a bike. (AR at 223.) He reported that he was limited in what he could lift, and could only stand, walk, and sit for short periods of time.[1] (AR at 224-25.) Section C, discussing plaintiff's testimony at his hearing before the ALJ, includes additional information about plaintiff's personal and work history, injuries, and symptoms.

### B. Relevant Medical History

As plaintiff summarizes, he has been diagnosed with lumbar herniations, bulging discs, stenosis, lumbar spondylosis, lumbar and cervical radiculopathy, facet arthritis, thoracic or lumbosacral neuritis or radiculitis, shoulder tendinitis, hypertension, and anxiety. (AR at 266, 269, 275-76, 280, 291, 295, 310, 314, 318, 322, 332, 388, 418, 463, 476.)

1. Medical Evidence Before the July 4, 2012 Alleged Onset Date

On January 6, 2011, plaintiff went to the Winthrop University Hospital emergency room with complaints of left shoulder, left

---

[1] Plaintiff estimated that he could walk for about 15 minutes before having to stop and rest for three to five minutes. (AR at 226.)

hip, and left lower back pain after falling at work while trying to stop an inmate fight. (AR at 337-40, 368.) The emergency room doctor noted paresthesia in the legs and injuries to the shoulder, hip, and back with radiculopathy. (AR at 338.) Plaintiff was treated with a Medrol Dose Pack and referred for an orthopedic consultation. (*Id.*)

On January 11, 2011, plaintiff visited Charles Ruotolo, M.D. ("Dr. Ruotolo"), at Total Orthopaedics & Sports Medicine ("Total Orthopaedics"). (AR at 368.) Plaintiff reported pain with lifting or strenuous activity after an injury at work. (*Id.*) Dr. Ruotolo noted that plaintiff reported a pain level of six out of ten in his left hip, left shoulder, and lower back radiating into his leg; had numbness/tingling down the posterior and lateral left thigh to the knee; and was tender to palpation of the left hip. (*Id.*) Plaintiff also reported that his left shoulder soreness was mild and had "pretty much resolved." (*Id.*) Plaintiff was not working at the time, but intended to return to work when medically cleared. (*Id.*) An examination of plaintiff's hips showed normal gait; range of motion of 0 to 140 degrees in flexion and extension, 0 to 40 internal rotation, 0 to 45 external rotation, 0 to 60 abduction, and 0 to 30 adduction; normal motor strength; and intact sensation and reflexes. (AR at 369.) Dr. Ruotolo noted that plaintiff had no observable difficulties standing, walking, sitting, or arising from a seated position. (*Id.*) Dr. Ruotolo prescribed Naprosyn for pain and noted that plaintiff was to have a magnetic resonance imaging ("MRI") scan of his lumbar spine, and referred him to Karen Avanesov, D.O. ("Dr. Avanesov"), for an evaluation of his spine. (AR at 370.) Dr. Ruotolo found that plaintiff was "temporarily totally disabled" pending MRI results. (*Id.*)

Plaintiff's January 19, 2011 MRI showed: L3-L4 disc bulging with no more than mild bilateral neural foraminal stenosis;

five millimeter "retrolisthesis of L4 on L5," L4-L5 disc bulging and central to left paracentral disc herniation result[ing] in moderate bilateral neural foraminal stenosis without spinal canal compromise, and a small L4-L5 annular tear; and grade I anterolisthesis of L5 on S1 with bilateral chronic-appearing L5 spondylolysis, associated L5-S1 disc pseudo bulging and facet arthropathy resulting in mild right and moderate left-sided neural foraminal stenosis. (AR at 332.)

On January 24, 2011, plaintiff returned to Total Orthopaedics and met with Dr. Avanesov, who reviewed his MRI results. (AR at 365.) Dr. Avanesov examined plaintiff and found plaintiff had normal gait and posture; spasms in the lower lumbar paraspinal muscles and tenderness to palpation, with more pain to palpation on the left side; range of motion of the back of 40 degrees in forward flexion, 20 in extension, 20 in left side bending or rotation, and 30 in right side bending or rotation; straight leg raise to 20 degrees on the left and negative on the right; full muscle strength and tone; normal neurological sensory testing, although plaintiff had deep dull pain and paresthesia in the left buttock and posterior thigh; and deep tendon reflexes of 2/2 on both sides. (AR at 365-67.) Plaintiff rated the level of pain in his left leg a five out of ten. (AR at 365.) He reported that his symptoms were exacerbated by bending and sleeping. (*Id.*) Dr. Avanesov diagnosed plaintiff with spinal instability at L4-5 and L5-S1, left lumbar radiculopathy, and degenerative disc disease at L4-5 and L5-S1. (AR at 366.) He found plaintiff was "temporarily totally disabled," prescribed Vicodin and Valium, and referred plaintiff for four weeks of physical therapy three to five times per week. (AR at 367.)

On February 21, 2012, plaintiff saw Dr. Avanesov again and reported left leg pain,

which was aggravated by sitting and sleeping, and which plaintiff said nothing, including physical therapy, alleviated. (AR at 362.) Plaintiff reported that his pain had increased to a level of seven out of ten. (*Id.*) Dr. Avanesov found spasms in the bilateral lumbar paraspinal muscles and left sciatic region; tenderness to palpation at the lumbar spine, especially around facet joints of the lower lumbar segment; impaired lumbar range of motion, with flexion to 40 degrees, extension to 20 degrees, and lateral bending and rotation to 30 bilaterally; and positive straight leg raise on the left at 20 degrees. (AR at 362-63.) He diagnosed plaintiff with L4-5 and L5-S1 left foraminal stenosis; L4-5 and L5-S1 facet hypertrophy; L4-5 and L5-S1 grade retrolisthesis; L5-S1 grade spondylolisthesis; L5 spondylosis; and L4-5 and L5-S1 degenerative disease. (AR at 363-64.) Dr. Avanesov recommended continuing with "conservative care" and another six weeks of physical therapy, prescribed Norco, and referred plaintiff for pain management and electromyography and nerve conduction velocity ("EMG/NCV") studies of the lower extremities. (AR at 364.)

On March 3, 2011, plaintiff saw Luis Alejo, M.D. ("Dr. Alejo"), at Total Orthopaedics. (AR at 357.) Dr. Alejo reviewed plaintiff's EMG/NCV results and found that the study was consistent with lumbar radiculopathy with greater involvement at the L4/5 level. (AR at 359.) He noted "persistent and radiating low back pain down [plaintiff's] left lower extremity associated with numbness and pain and spasms in the lower back as well as the lower extremity." (AR at 268.)

On March 4, 2011, plaintiff saw police surgeon Louis Lombardi, M.D. ("Dr. Lombardi"). (AR at 318.) Plaintiff complained of back pain radiating to the left buttock and lower extremity. (AR at 318.) Dr. Lombardi reviewed plaintiff's MRI and examined plaintiff, and found para lumbar tenderness with spasm; flexion to 60 degrees; positive facet load test; and dysesthesias in the left buttock and posterior thigh/leg. (AR at 318.) Dr. Lombardi diagnosed plaintiff with herniated discs at L4-5 and C5-6, facet arthritis, and chronic neck pain, and concluded that plaintiff was "unable to perform restricted assignment." (*Id.*) The doctor recommended that plaintiff return in two weeks "to determine possible return to restricted assignment." (*Id.*)

On March 21, 2011, Dr. Avanesov examined plaintiff and found that his "physical examination [was] unchanged." (AR at 355.) He noted continued complaints of lower back pain radiating to the left buttock and down his leg to his foot. (*Id.*) Plaintiff reported that his symptoms were aggravated by sitting, standing, and sleeping, and complained of some paresthesia and numbness in the left lower extremity. (*Id.*) Dr. Avanesov found that plaintiff had antalgic gait during the stance phase, positive straight leg raise on the left at 20 degrees, and full motor strength (neurovascular intact). (*Id.*) Dr. Avanesov recommended that plaintiff see a pain management specialist for lumbar epidural steroid injections, "since his pain is uncontrollable." (*Id.*) He recommended that, if the injections failed to resolve plaintiff's pain, he schedule lumbar decompression and possible fusion. (AR at 356.)

Plaintiff saw pain management physician Timothy D. Groth, M.D. ("Dr. Groth"), on March 30, 2011. (AR at 279.) Plaintiff reported pain from sitting for too long, standing, and sleeping, but stated that he had no problem walking. (*Id.*) Climbing stairs, coughing, and sneezing also aggravated plaintiff's pain. (*Id.*) Plaintiff reported that the lower back pain radiated down his lower left extremity, with a burning, aching, and tingling sensation. (*Id.*) He rated his pain a

three to six out of ten, and reported that it interfered with sleeping, sports, housework, and exercise. (*Id.*) Dr. Groth reviewed plaintiff's MRI, and examined plaintiff and found lumbar spine flexion of 80 degrees and extension to 5 degrees, no significant spinal tenderness, positive left-sided straight leg raise, and that plaintiff was unable to toe walk on the left. (AR at 280.) Dr. Groth noted that his impression was lumbar radiculopathy. (*Id.*) From April 2011 to July 2011, Dr. Groth administered a series of injections. (AR at 274.) On August 23, 2011, Dr. Groth completed a Workers' Compensation Board form indicating that plaintiff had 100 percent temporary impairment. (AR at 290-91.)

On August 24, 2011, orthopedic surgeon Stuart Kandel, M.D. ("Dr. Kandel"), performed an orthopedic evaluation at the request of the Workers' Compensation Board. (AR at 308-311.) Dr. Kandel noted that plaintiff complained of lower back pain radiating to his left buttock and left lower extremity. (AR at 309.) Plaintiff informed Dr. Kandel that he had not worked since his injury on January 6, 2011, and was applying for retirement. (*Id.*) Dr. Kandel examined plaintiff and found range of motion in the lumbar spine of 60 degrees in flexion, 20 degrees in extension, and 40 degrees right and left lateral flexion; no muscle spasm; normal sensation; no gross muscle weakness; 2+ reflexes; and negative straight leg raise bilaterally. (*Id.*) Dr. Kandel reviewed plaintiff's medical records, including his MRI and records from Drs. Groth and Avanesov. (AR at 309-10.) Dr. Kandel diagnosed plaintiff with a lumbosacral sprain superimposed on degenerative disease of the lumbar spine with radiculopathy. (AR at 310.) He found that plaintiff had a "moderate partial disability which should be considered to be permanent in nature." (*Id.*) Dr. Kandel found that plaintiff was capable of performing full-time work that did not require repeated bending or lifting of materials weighing more than ten to fifteen pounds. (*Id.*) Additionally, he noted that plaintiff was not capable of returning to his usual job and, specifically, that he was not capable of having direct prisoner contact. (*Id.*)

Plaintiff saw Dr. Avanesov five times, approximately once a month, from March through September 2011. (AR at 341-56.) On June 29, 2011, Dr. Avanesov noted increased pain, that lumbar range of motion remained limited, and positive straight leg raise on the left at 30 degrees. (AR at 351-52.) He noted that plaintiff was due for his third epidural injection and prescribed Valium. (AR at 352.) On August 15, 2011, Dr. Avanesov found plaintiff's condition unchanged as to his lumbar, neck, and left leg pain, and continued to find limited range of motion and point tenderness to palpation in the lower lumbar spine, despite the injection the prior month. (AR at 348-49.) On September 19, 2011, Dr. Avanesov again found plaintiff's condition unchanged as to his pain, tenderness to palpation, and limited range of motion. (AR at 344.) At both the August and September 2011 visits, Dr. Avanesov offered plaintiff lumbar decompression and stabilization surgery, but noted that plaintiff wanted to continue with conservative care. (AR at 344, 349.)

On September 29, 2011, Dr. Avanesov completed a Workers' Compensation report based on his September 19, 2011 examination, in which he diagnosed plaintiff with lumbago, thoracic or lumbosacral neuritis or radiculitis, and congenital spondylolisthesis, and reported that plaintiff had 100 percent temporary impairment. (AR at 341-42.)

At a visit with Dr. Alejo on October 19, 2011, plaintiff reported that he was "very limited with respect to bending, lifting and walking" due to his pain. (AR at 422.) Dr. Alejo noted persistent lumbar tightness and

that trigger points were present, very tight and guarded range of motion, and antalgic gait. (*Id.*) Dr. Alejo recommended a chiropractic consultation, and noted that plaintiff agreed to have one. (*Id.*) He also recorded that plaintiff was "100% disabled from work." (*Id.*)

Plaintiff saw Dr. Alejo again on December 7, 2011 and reported that he did not attend chiropractic care because his insurance company was not going to approve it. (AR at 423.) At this visit and a December 28, 2011 visit, Dr. Alejo adjusted plaintiff's pain medications. (AR at 423-24.) At the December 7, 2011 visit, [2] Dr. Alejo "attempt[ed] to wean [plaintiff] off the Neurontin." (AR at 423.) Then, on finding at the December 28, 2011 visit that plaintiff "was not able to tolerate the weaning without increasing his symptoms," Dr. Alejo put plaintiff back on his regular Neurontin dose. (AR at 424.) Dr. Alejo also referred plaintiff for a second opinion on pain management. (*Id.*) He noted in Workers' Compensation reports based on these examinations that plaintiff was "temporarily totally disabled," and diagnosed thoracic or lumbosacral neuritis or radiculitis. (AR at 382-83, 385-86.)

On January 5, 2012, plaintiff visited Aristide Burducea, D.O. ("Dr. Burducea"), from Orthopedics Spine & Sports, who noted "decreased forward flexion, extension and lateral flexion" of the lumbar spine and positive straight leg raise on the left. (AR at 394-95.) Dr. Burducea diagnosed lumbar radiculopathy, degenerative disc disease, and facet arthropathy, and ordered an L5 and S1 transforaminal steroid injection. (AR at 394.) Dr. Burducea noted in a Workers' Compensation report based on this

examination that plaintiff had 100 percent temporary impairment. (AR at 391-92.)

On February 1, 2012, Dr. Alejo found that plaintiff had "significant discogenic findings with respect to his lumbar spine MRI inclusive of L3-L4 bulging disks, retrolisthesis of L4 and L5 with herniation as well as at L4-L5." (AR at 425.) He also found an annular tear at L4-5, a disc bulge at L5-S1, tightness in the lumbar spine, trigger points, limited range of motion, and antalgic gait. (*Id.*) Dr. Alejo referred plaintiff for physical therapy, recommended another trial of epidural steroid injections, and noted that his opinion was that plaintiff was "100% disabled from his specific occupation." (*Id.*)

On February 17, 2012, impartial medical expert Gerald Greenberg, M.D. ("Dr. Greenberg"), completed a medical interrogatory regarding plaintiff's condition. (AR at 396.) Dr. Greenberg found that plaintiff's impairments did not meet an impairment in the "Listing of Impairments," and that plaintiff should be capable of sedentary work "within less than one year" of his January 2011 injury. (AR at 396-98.)

On March 26, 2012, Dr. Avanesov wrote a "narrative report on [plaintiff]." (AR 399-401.) Dr. Avanesov noted that plaintiff returned to light duty work in February 2012. (AR at 399.) He also noted that plaintiff continued to complain of pain in his lower back and left leg that "ha[d] been constant ever since the injury and not improved despite extensive therapy," and which he rated a pain level of seven out of ten. (AR at 399-400.) Based on his physical examination that day, Dr. Avanesov found that plaintiff had significantly reduced lumbar range of motion, full muscle strength in his lower extremities, normal reflexes, numbness and

[2] Dr. Alejo again noted plaintiff's persistent lower back pain, and found "[l]umbar spine antalgic loading,

very stiff, and guarded on active flexion and extension." (AR at 423.)

paresthesia, no sensation to light touch and pinprick in his left L5 and S1 dermatomal distribution, and positive straight leg raise on the left at 30 degrees. (AR at 400.) He diagnosed plaintiff with left lumbar radiculopathy at L4-5 and L5-S1, mechanical lower back pain secondary to L4-5 retrolisthesis and L5-S1 spondylolisthesis, disc herniations, L5 spondylosis, degenerative disc disease involving the lower lumbar spine, facet hypertrophy at L4-5 and L5-S1, and left L4-5 and L5-S1 neural foraminal stenosis. (*Id.*)

Dr. Avanesov stated in this report that plaintiff was unable to continue working as a correction officer in his facility. (AR at 401.) He noted that plaintiff's functional restrictions for dynamic abilities, such as lifting, carrying, pushing, and pulling, should be reduced to a minimum, and that plaintiff needed to avoid climbing, bending, stooping, kneeling, and reaching. (*Id.*) He also found that plaintiff was limited to walking, sitting, and standing approximately one hour at a time with a prolonged rest in between. (*Id.*) He noted that plaintiff should be restricted to light activities requiring him to exert no more than twenty pounds of force occasionally and not more than ten pounds frequently. (*Id.*) He also indicated that plaintiff "sustained total moderate disability and will require surgical intervention in the future in order to treat his problem." (*Id.*)

Plaintiff saw Dr. Alejo on April 17, 2012 and May 29, 2012, and continued to complain of lower back pain. (AR at 426-27.) On April 17, 2012, plaintiff informed Dr. Alejo that his insurance company "is no longer approving any physical therapy." (AR at 426.) An independent medical examiner physician from the insurance company had cleared plaintiff "to perform light duty only." (*Id.*) Plaintiff told Dr. Alejo that this work bothered his back because there was no room to stretch. (*Id.*) He also told Dr. Alejo that he was afraid of attempting surgery. (*Id.*) Dr. Alejo's assessment was that "[a]t this point in time, [plaintiff] has failed conservative treatment." (*Id.*) He noted, however, that plaintiff did not want another set of epidural injections, and was "afraid of the surgical procedure." (*Id.*) Dr. Alejo again indicated that plaintiff was "100% disabled from performing his occupation as a corrections officer." (*Id.*) Dr. Alejo completed another report for Workers' Compensation based on this visit, noting the same diagnoses as in past reports—thoracic or lumbosacral neuritis or radiculitis—and that plaintiff was temporarily totally disabled. (AR at 405.)

On May 29, 2012, Dr. Alejo noted the same diagnoses as he had previously based on plaintiff's MRI, and summarized that plaintiff's three epidurals were not helpful, and that physical therapy helped, but only on a very temporary basis (and, regardless, plaintiff's insurance would no longer cover physical therapy). (AR at 404.) Dr. Alejo diagnosed plaintiff with chronic low back pain with radiculopathy and spasms secondary to disc herniation, as well as multi-level disc bulges, and noted that plaintiff was "100% disabled from performing his occupation." (*Id.*) He also noted again that plaintiff had "failed conservative treatment" and was "deferring surgery at this time. He was scared of the procedure, I do understand." (*Id.*)

### 2. Medical Evidence After the July 4, 2012 Alleged Onset Date

On June 4, 2012,[3] plaintiff went to the Winthrop University Hospital emergency

---

[3] Although plaintiff's medical records show that his injury occurred on June 4, 2012, plaintiff alleged a disability onset date of July 4, 2012 in his application for Social Security benefits (AR at 129), and the ALJ used that date in his decision (AR at 17). The Court,

room after injuring his right shoulder, and experiencing neck spasms. (AR at 411-17.) On June 5, 2012, Dr. Alejo wrote a note stating that, due to this injury, plaintiff was under his "active care" for a right shoulder rotator cuff injury and that, due to this injury, he was "totally disabled and unable to work until further notice." (AR at 417.)

Plaintiff had a right shoulder MRI taken on June 27, 2012. (AR at 418.) The MRI showed hypertrophic change of the acromioclavicular joint, prominent tendinosis of the supraspinatus tendon and focal bursal surface tear at the insertion, subchondral cystic degenerative change of the humeral head, and a small cyst in the adjacent soft tissue. (*Id.*)

On July 6, 2012, plaintiff saw Robert Lippe, M.D. ("Dr. Lippe"), at Orlin & Cohen Orthopedic Associates.[4] (AR at 419.) Plaintiff reported that he injured his right shoulder at work during an altercation on June 4, 2012, when he was on restricted duty supervising inmates. (*Id.*) Dr. Lippe noted that plaintiff had no prior shoulder issues, and that the shoulder pain did not affect plaintiff's ability to sleep. (*Id.*) He also noted that plaintiff had therapy and an MRI and "now feels he's ready to return to work." (*Id.*)

Plaintiff had multiple visits with Dr. Alejo for his lower back pain from July 19, 2012 through August 15, 2013. (AR at 428-38, 492.) On July 19, 2012, plaintiff reported that his "episodes of pain ha[d] not improved[,] in fact they are increasing," as were his spasms. (AR at 428.) Dr. Alejo stated, as before, that plaintiff was "100% disabled from his occupation." (*Id.*) In describing his work, plaintiff stated that "they ha[d] him pushing buttons on the job at this

time." (*Id.*) This report does not discuss plaintiff's right shoulder condition. (*Id.*)

On December 12, 2012, Dr. Alejo noted "[c]hronic persistent low back pain and radiculopathy for multilevel discogenic sources." (AR at 431.) He also reported that plaintiff learned physical therapy exercises that he could perform at home to try to improve his range of motion, but could not lift any weights and was instructed to find a facility with an indoor pool where he could perform aerobic exercises without weight-bearing stress on his lower back. (*Id.*)

On March 5, 2013, plaintiff reported to Dr. Alejo that he had retired. (AR at 433.) He informed Dr. Alejo that his pain "ha[d] not been getting worse, especially since he is now retired." (*Id.*) Dr. Alejo still found plaintiff's lumbar spine to be stiff and range of motion limited. (*Id.*) On May 22, 2013, Dr. Alejo noted that plaintiff "still has persistent intermittent low back pain," as well as trigger points and limited range of motion. (AR at 438.)

On August 15, 2013, plaintiff reported that he could not be active and was gaining weight in his retirement because of his back pain. (AR at 492.) Plaintiff still did not want surgery; Dr. Alejo noted that he was scared of the procedure. (*Id.*) Dr. Alejo recommended epidural injections for plaintiff's "acute severe pain" and weight watchers for weight loss. (*Id.*)

On August 28, 2013, plaintiff saw Chaim Shtock, D.O. ("Dr. Shtock"), for a consultative orthopedic examination for the Social Security Administration Division of Disability Determination. (AR at 439-46.) Dr. Shtock does not discuss reviewing any of plaintiff's other medical records. (AR at 439-42.) Plaintiff complained of lower back pain

---

therefore, uses the July 4, 2012 date for the purposes of this opinion.

[4] The administrative record contains only the first page of Dr. Lippe's notes from plaintiff's visit. (AR at 419.)

ranging from five to nine out of ten. (AR at 439.) Plaintiff stated that his lower back pain radiated down his left leg with numbness and tingling; was aggravated by prolonged sitting, standing, and bending over; and was relieved by rest, refraining from aggravating activities, and over-the-counter anti-inflammatory medication. (*Id.*) Plaintiff also complained of tightness and stiffness in his neck that he typically experienced once a week, and which was aggravated by turning his neck. (*Id.*) Dr. Shtock noted that plaintiff's activities of daily living included that he was "independent" in cooking, light cleaning, laundry, shopping, showering, dressing, and grooming. (AR at 440.) Plaintiff reported that he watched television, listened to the radio, read books, went to doctor's appointments, and visited friends. (*Id.*)

Dr. Shtock examined plaintiff at this visit and found that plaintiff appeared to be in no acute distress, had normal gait, walked on his heels and toes without difficulty, needed no help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. (*Id.*) Plaintiff could not, however, squat beyond 40 percent. (*Id.*) Dr. Shtock found that plaintiff had intact hand and finger dexterity, and 5/5 right and 4+/5 left grip strength. (AR at 441.) He found that plaintiff's cervical spine showed flexion to 40 degrees, extension to 30 degrees, side bending to 30 degrees bilaterally, and rotation to 55 degrees bilaterally, and plaintiff had no tenderness, paracervical pain, or spasm. (*Id.*) Dr. Shtock found that plaintiff had full range of motion in his upper extremities, full strength, no sensory abnormalities, and physiologic and equal reflexes. (*Id.*) He found that plaintiff's thoracic and lumbar spine showed flexion to 60 degrees, extension to 10 degrees, and lateral flexion and rotary movements to 20 or 25 degrees bilaterally. (*Id.*) Plaintiff reported left lumbar paraspinal tenderness,

but had no spasm. (*Id.*) Straight leg raising was positive at 35 degrees bilaterally in the sitting position. (*Id.*) In plaintiff's lower extremities, Dr. Shtock found plaintiff had 4+/5 muscle strength in the proximal and distal muscles bilaterally with no muscle atrophy or sensory abnormality, deep tendon reflexes in his left knee of 1+, decreased sensation to light touch over the left leg and lateral aspect of the left foot, and no joint effusion, inflammation, or instability. (*Id.*) A cervical spine x-ray showed straightening. (*Id.*)

Dr. Shtock noted in his "medical source statement" that plaintiff had moderate limitations for heavy lifting, squatting, crouching, frequent stair climbing, walking long distances, and frequent bending. (AR at 442.) Plaintiff had mild to moderate limitations for sitting and standing for long periods. (*Id.*) He had no limitations for performing overhead activities with both arms or for fine and gross motor activity with his hands, and "no other physical functional deficits in [the doctor's] opinion." (*Id.*)

On October 10, 2013, Dr. Alejo noted that plaintiff was "very leery of any surgical procedures." (AR at 491.) Dr. Alejo noted that epidural injections did not work, and that plaintiff "may benefit from more physical therapy, but he already has had extensive therapy." (*Id.*) Dr. Alejo again noted that plaintiff was "100% permanently disabled from his previous occupation." (*Id.*) He noted that he would follow up with plaintiff in the next several weeks if his pain did not resolve or decrease. (*Id.*)

Plaintiff saw Dr. Alejo again on December 12, 2013. (AR at 490.) Dr. Alejo noted he was "giving [plaintiff] some Tylenol #3," and that plaintiff would follow up with him for pain. (*Id.*)

On February 19, 2014, plaintiff saw Dr. Alejo and reported continued lower back

pain, that he had been completely unable to work since the injury, and that none of the previous treatment helped. (AR at 488-89.) Plaintiff visited Dr. Alejo again on May 1, June 12, July 3, and September 4, 2014. (AR at 479-87.) Dr. Alejo made similar findings at these visits, including lumbar radiculopathy, tight lumbar spine, limited range of motion, antalgic loading, and lower back pain. (*Id.*) Dr. Alejo continued to find that plaintiff was "100% permanently disabled from his previous occupation as a corrections officer." (AR at 479, 482, 485.)

On September 23, 2014, plaintiff had a cardiovascular consultation with Roger S. Kersten, D.O. ("Dr. Kersten"). (AR at 499.) Plaintiff told Dr. Kersten that he was retired, and had a "secondary disability" from his job as a correction officer. (AR at 500.) Plaintiff informed Dr. Kersten that he used an elliptical machine for exercise. (*Id.*)

On October 31, 2014, plaintiff was in a car accident. (AR at 466.) Plaintiff was in the driver's seat when the car was rear-ended, and the airbags did not deploy. (*Id.*) Plaintiff's records indicate that he denied having a loss of consciousness, but that, at the time of the accident, he experienced head, lower back, and right shoulder pain. (*Id.*)

On November 5, 2014, plaintiff visited Dr. Alejo, who noted that plaintiff had been in a motor vehicle accident and complained that his lower back pain had gotten worse. (AR at 457.) Dr. Alejo also noted "neck and back pain," and that this assessment was new. (AR at 460.) Dr. Alejo ordered MRIs of plaintiff's cervical and lumbar spine, recommended physical therapy, and encouraged plaintiff to lose weight. (AR at 459-60.)

A cervical spine MRI taken on November 10, 2014 showed: straightening of the cervical lordosis with central cord impingement and bilateral exiting nerve root impingement at C5-C6, asymmetrical left neural foraminal narrowing at C3-C4, bilateral neural foraminal narrowing greater on the left at C4-C5, and asymmetrical left neural foraminal narrowing at C6-C7 without acute fracture or cord compression. (AR at 456.)

On November 14, 2014, Dr. Alejo saw plaintiff and reviewed his cervical spine MRI. (AR at 452.) He noted that plaintiff had a history of anxiety, lumbar back pain with radiculopathy, and hypertension. (*Id.*) Based on his examination, Dr. Alejo found that plaintiff had a stiff head and neck; tenderness and tightness in the spine, ribs pelvis, and cervical spine; guarded and limited lumbar range of motion with antalgic loading; bilateral shoulder motion guarded from neck pain; and hip motion guarded from lower back pain. (AR at 454.) Dr. Alejo referred plaintiff for physical therapy twice to three times per week for eight weeks, noted EMG/NCV pending, and prescribed Tylenol with Codeine #3 and Mobic. (AR at 454-55.)

Plaintiff had EMG/NCV studies performed on December 3, 2014. (AR at 461.) The studies showed "evidence of bilateral C6-C7 Radiculopathy." (AR at 463.) That same day, Dr. Alejo saw plaintiff and reviewed his EMG/NCV studies. (AR at 511.) He noted antalgic gait, stiffness in his neck; tenderness in his spine, ribs, c-spine, and lumbar spine, with guarded and limited lumbar range of motion; guarded range of motion of both shoulders due to neck pain; and guarded range of motion of both hips due to lower back pain. (AR at 511-12.) Dr. Alejo and plaintiff also discussed the importance of regular exercise. (*Id.*)

On February 23, 2015, plaintiff saw chiropractor Ruth A. Vitaglione, D.C. ("Dr. Vitaglione"), for an independent medical examination for his No-Fault insurance claim related to his car accident. (AR at 466.) On examination, Dr. Vitaglione noted that

plaintiff was experiencing headaches, neck pain, stiffness, tightness, tingling down his right arm, and lower back pain. (AR at 467.) She also found that plaintiff moved about without difficulty and had good posture, even gait, and normal movements. (AR at 468.) An examination of the cervical spine and upper extremities showed palpation tenderness over the bilateral trapezius area, but no spasms or active trigger points. (*Id.*) Plaintiff's range of motion was within normal limits and did not elicit complaints of pain. (*Id.*) Plaintiff had +2 symmetric reflexes, no alteration of normal sensation, and full motor function. (*Id.*) An examination of the lumbar spine and lower extremities showed palpation tenderness at L4-L5, no spasms, and range of motion within normal limits at 60 degrees in flexion, 25 in extension, and 25 in lateral flexion bilaterally. (AR at 469.) Plaintiff had +2 symmetric reflexes, no alteration of normal sensation, and full motor functioning. (*Id.*) Plaintiff was able to walk on his heels and toes, and straight leg raise was negative to 90 degrees bilaterally. (*Id.*)

Dr. Vitaglione diagnosed plaintiff with a resolving cervical and lumbar strain/sprain. (*Id.*) She stated that it was "[her] professional opinion, based on the clinical evaluation of [plaintiff] . . . that a causal relationship exists between the injuries sustained and the accident, superimposed on prior cervical and lumbar spine injuries." (*Id.*) She also recommended continued chiropractic care once a week for six weeks, followed by another assessment at the end of that period. (AR at 470.)

On February 23, 2015, plaintiff also saw orthopedic surgeon Richard Weiss ("Dr. Weiss") for an independent examination for his No-Fault insurance claim. (AR at 472-75.) Dr. Weiss examined plaintiff's cervical spine and found that plaintiff had mild spasm and tenderness; range of motion to 45 of 50 degrees in flexion, 45 of 60 degrees in extension, 60 of 80 degrees in rotation on the right and 70 of 80 on the left, and 35 of 45 degrees lateral flexion on the right and 40 of 45 on the left; full motor strength; and normal sensation. (AR at 474.) Dr. Weiss examined plaintiff's lumbar spine and found mild spasm and tenderness; range of motion to 50 of 60 degrees in flexion, 20 of 25 in extension, and 20 of 25 in lateral bending bilaterally; normal sensation; and 2+ reflexes. (*Id.*) Straight leg raise was positive on the left at 70 degrees. (*Id.*) Dr. Weiss found that plaintiff had a resolving cervical and lumbar strain/sprain. (*Id.*) Dr. Weiss noted that plaintiff was retired, "so work [wa]s not an issue." (AR at 475.)

Plaintiff saw Dr. Alejo again on February 25, 2015. (AR at 476.) Dr. Alejo found that plaintiff showed no notable changes, and made similar findings as at past visits. (AR at 476-78.) At a March 25, 2015 visit, Dr. Alejo noted that plaintiff complained of worsening lower back and neck pain as a result of his motor vehicle accident, and recommended a cervical epidural injection. (AR at 525.)

Plaintiff also saw Dr. Kersten again on March 25, 2015, and reported intermittent neck pain and mild to moderate lower back pain. (AR at 493.)

On April 22, 2015, Dr. Alejo completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form.[5] (AR at 528-33.) Dr. Alejo stated that, since March 6, 2011, plaintiff could lift and carry up to twenty pounds occasionally, and could sit, stand, or walk less than one hour each. (AR at 528-29.) Dr. Alejo did not respond to

---

[5] This is a Social Security Administration, Office of Disability Adjudication and Review form.

the question in this form that asked, if the total time for sitting, standing, and walking, was less than eight hours, what the individual could do for the remainder of an eight-hour work day. (AR at 529.) Dr. Alejo described the extent to which plaintiff could perform other activities: plaintiff could reach and push or pull occasionally; plaintiff could occasionally use his right foot to operate foot controls, but could never do so with his left foot; plaintiff could never climb, crouch, or crawl; and plaintiff could never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, pulmonary irritants, extreme cold or heat, or vibrations. (AR at 530-31.) Plaintiff could, however, use his hands frequently for handling, fingering, and feeling; occasionally stoop and kneel; frequently balance; and frequently operate a motor vehicle. (*Id.*) Dr. Alejo indicated that plaintiff's limitations had lasted for over a year. (AR at 533.)

On May 21, 2015, plaintiff saw Andrea Pollack, D.O. ("Dr. Pollack"), for an orthopedic examination for the Division of Disability Determination. (AR at 535.) Dr. Pollack noted that plaintiff complained of lower back and neck pain "suffered in a work-related injury as well as a car accident." (*Id.*) Plaintiff also reported daily headaches and described his lower back pain as constant and sharp, rated it a pain level of eight to nine out of ten, and reported that it radiated into his left foot and left arm. (*Id.*) Dr. Pollack observed that plaintiff needed no help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. (AR at 536.) She noted that plaintiff had intact hand and finger dexterity and full grip strength. (*Id.*) She examined plaintiff's cervical spine and found range of motion to 15 degrees in flexion and extension, 5 degrees in left lateral flexion bilaterally, and 30 degrees in rotary movements bilaterally; cervical and paracervical tenderness; and no trigger

points. (*Id.*) Dr. Pollack examined plaintiff's upper extremities and found range of motion limitations in his shoulders, but otherwise full range of motion; full strength; no sensory abnormality; and physiologic and equal reflexes. (*Id.*) She examined his lumbar spine and found range of motion to 30 degrees in flexion and extension, 10 degrees in lateral flexion bilaterally, and 10 degrees in rotary movements bilaterally; and lumbar and lumbar paraspinal tenderness. (*Id.*) Dr. Pollack found straight leg raise was negative bilaterally. (*Id.*) She also found some range of motion limitations in plaintiff's lower extremities, but full strength, no sensory abnormalities, no muscle atrophy, and physiologic and equal reflexes. (AR at 537.) She concluded that plaintiff had the following restrictions: a marked restriction in bending, lifting, carrying, pushing, and pulling; a mild restriction in reaching; and moderate to marked restrictions in walking, standing, sitting, climbing stairs, kneeling, and squatting. (*Id.*)

On October 5, 2015, Dr. Pollack completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form. (AR at 556-61.) Dr. Pollack reported that plaintiff could do the following activities: lift and carry up to ten pounds continuously and 20 pounds occasionally; sit for 30 minutes, stand for 15 minutes, and walk for 15 minutes, each at one time without interruption; stand for one hour, walk for one hour, and sit for eight hours total in an eight-hour workday. (AR at 557.) Dr. Pollack also found that plaintiff could do the following: occasionally use his hands for pushing and pulling, frequently for reaching, and continuously for handling, fingering, and feeling; and occasionally climb stairs and ramps and balance, stoop, kneel, crouch, and crawl. (AR at 558-59.) She found that he could never do the following: use his feet to operate foot controls, or climb ladders or scaffolds. (*Id.*) She also found that plaintiff

could never be exposed to unprotected heights, extreme cold or heat, or vibrations; but could occasionally be exposed to moving mechanical parts, operating a motor vehicle, and humidity and wetness, and continuously to pulmonary irritants. (AR at 560.) Dr. Pollack found that plaintiff was limited to a quiet or library-type noise. (*Id.*) She found that he could perform activities such as shopping; traveling without a companion for assistance; using standard public transportation; preparing simple meals and feeding himself; and sorting, handling, and using paper files. (AR at 561.) Dr. Pollack identified plaintiff's neck and back pain and headaches as the particular medical or clinical findings supporting her assessment. (AR at 560.)

On June 13, 2015, medical expert John F. Kwock, M.D. ("Dr. Kwock"), an orthopedic surgeon, completed the same "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form. (AR at 563-71.) Dr. Kwock never examined plaintiff, but completed this form based on the evidence the Social Security Administration furnished for him regarding plaintiff's condition. (AR at 569.) Dr. Kwock reported that he found that plaintiff had a "mild impairment in lifting and carrying capacity" and in "overhead use of [the] left shoulder." (*Id.*) In response to the question asking whether plaintiff's impairments met or equaled the criteria of a listed impairment, Dr. Kwock answered no, although he stated that plaintiff's cervical and lumbar spine impairments met Listing 1.04A. (AR at 570.) He qualified, however, that the level of severity of plaintiff's impairments did not meet Listing 1.00(b)(2)(b) or (c). (*Id.*) Dr. Kwock did not respond to the question asking for additional information if plaintiff had an impairment that met one of the listed impairments. (*Id.*) The next question asked, if plaintiff was found not to meet or equal a listing, for the medical expert to identify any functional limitations or restrictions that result from the impairments listed earlier in the form. (AR at 571.) Dr. Kwock wrote that the "objective evidence" was "somewhat contradictory," but that, "on physical examination [plaintiff] d[id] not appear to have much impairment from the root involvement in that motor/sensory examination is normal," and bilateral straight leg raise testing was normal. (*Id.*)

Dr. Kwock also reported in this form that plaintiff could do the following: lift and carry up to 10 pounds continuously, 20 pounds frequently, and 50 pounds occasionally; sit, stand, and walk for four hours each, and a total of seven hours in an eight-hour workday; use his hands continuously for all activities listed in the form except for reaching overhead with the left arm, which Dr. Kwock found he could do frequently; frequently use his feet to operate foot controls; frequently climb ramps and stairs and balance; and occasionally kneel and crouch. (AR at 563-66.) Dr. Kwock found that plaintiff could never climb ladders or scaffolds, stoop, or crawl. (AR at 566.) Dr. Kwock also found that plaintiff could be exposed occasionally to unprotected heights, and frequently to moving mechanical parts or operating a motor vehicle. (AR at 567.) Dr. Kwock found that plaintiff could perform activities such as shopping; traveling without a companion for assistance; using standard public transportation; preparing simple meals and feeding himself; and sorting, handling, and using paper files. (AR at 568.)

C. Relevant Testimonial Evidence

The administrative hearing was held on April 30, 2015 in Central Islip, New York, before ALJ Patrick Kilgannon. (AR at 32.) Plaintiff testified that he had worked as a correction officer for Nassau County from 1995 until 2013, where he "[s]upervised inmates" and was responsible for their "[c]are, custody and control." (AR at 38.)

Plaintiff sustained injuries in a work accident in 2011, after which he returned to work from 2012 to 2013 and was assigned to light-duty work "in a restricted area with no inmate contact." (AR at 40, 44.) Plaintiff's responsibilities in his light-duty work capacity included "basically just opening gates and opening – pressing buttons." (AR at 44.) During this period, he was seated the majority of the time but had "room to move around and stretch." (*Id.*) Plaintiff had trouble performing this work because of his pain—he testified that he "was in pain pretty much every day [he] went to work"—and "took a lot of time off." (AR at 44-45.) Plaintiff retired on disability pension in January 2013. (AR at 45.)

Plaintiff testified that his pain from his injuries had gotten progressively worse. (*Id.*) He stated that his pain had been bad, but that it "got real bad" by May 2014. (*Id.*) Then, in late 2014, plaintiff injured his neck in a motor vehicle accident. (*Id.*) Plaintiff had "previous injuries to [his] neck from numerous inmate altercations, assaults, going back, and throughout [his] career," but his neck pain increased after his accident. (*Id.*) He testified that "the pain just got severely worse, but the headaches, the headaches were just really, really bad." (AR at 46.) Plaintiff stated that "[t]he pain going into [his] arm, [his] back pain got a little worse." (*Id.*)

Plaintiff testified that, at the time of the hearing, he had headaches daily that lasted an hour or longer. (*Id.*) Plaintiff testified that he had constant pain in his neck and lower back, providing the following description:

> From my back I get severe low back pain, I get burning, tingling, numbness going down my left leg, nerve pain. It almost, sometimes, feels like . . . when I try to get up, it feels like pins and needles, and my leg will give out. Just real difficulty doing anything with my back. It's

you know, pain – painful all day. With regards to my neck, I have problems sleeping and I can't get – I can't sleep at night. I can't get comfortable. Spasms a lot, where I could just – a slight turn in the shower will make me just not be able to move it for a few days, and turn my head. I also get headaches from my neck injury, on the base of my neck, radiating into my head, and sometimes I have to lay down.

(AR at 41.) Plaintiff stated that his neck pain "goes through like my top, [left] shoulder, into my [left] arm. Sometimes I get a little numbness and tingling in my fingers." (AR at 43, 47.) Plaintiff also discussed difficulty sleeping due to his neck pain, describing his sleep as "horrible," and testifying that he was "up every, probably hour, trying to get comfortable. I can't get comfortable with my neck, my back, so I get an hour at a time, and maybe – maybe four or five hours a night." (AR at 42.) Plaintiff testified that he napped "[p]retty much everyday" for approximately half an hour. (AR at 42-43.) He stated that he was most comfortable sitting, but that he could sit for only 20 to 25 minutes at a time before needing to "get up and switch positions." (AR at 43.) Plaintiff testified that he would sometimes keep his legs elevated while sitting in a massaging recliner, but would get up frequently to switch positions. (*Id.*) During the hearing, he requested permission from the ALJ to stand and stretch his legs. (AR at 46.)

He stated that he would take Codeine or Tylenol for his headaches and, "if it's really bad," he would lie down in bed and shut his eyes. (*Id.*) He testified that he had to lie down due to headaches daily. (*Id.*)

Plaintiff testified that he saw Dr. Alejo "for worker's comp[ensation] and no-fault" approximately every six weeks for each, and went to physical therapy three times per week

for his neck pain (although not for his back pain at the time of the hearing). (AR at 39-40.) Plaintiff testified that he took Meloxicam, Tylenol 3, Codeine, and Lisinopril for high blood pressure. (AR at 39.) Plaintiff testified that he had been receiving physical therapy for his lower back injury until Workers' Compensation "stopped" the treatment. (AR at 40.) Plaintiff testified that he experienced dizziness and fatigue from Meloxicam, and that extreme temperatures exacerbated his pain. (AR at 42.) Plaintiff had epidural injections in his lower back, but he testified that they only relieved his pain "[t]emporarily, for maybe a week, and then it just went back to the exact same thing." (AR at 39, 42.)

Plaintiff's doctor, Dr. Avanesov, recommended lumbar spine surgery, but plaintiff testified that he decided against it due to the risks. (AR at 40.) The doctor

> went over . . . both the risks and the success, and I just wasn't comfortable with a lot of the risks. I have three teenagers . . ., and one of my partners had the same surgery . . . [and] it wasn't successful. He's worse off now and I'm just scared to get that.

(AR at 40-41.) Plaintiff testified that his doctors have not recommended neck surgery. (AR at 41.)

Plaintiff testified regarding his daily activities: "I go to physical therapy three times a week, and, well, I don't do much. I watch TV, I read the paper, maybe try to read a book," but he testified that it was "tough concentrating" due to his pain. (AR at 43-44.) He testified that he only did "light" housework. (AR at 44.) He stated that he could pick up after himself, and would sometimes load the dishwasher or clean the countertops, "but that's about it." (*Id.*) Plaintiff testified that he used a computer, but

struggled to type because of numbness and tingling in his left hand. (AR at 47.) Plaintiff testified that he did not lift weights, estimated that he could lift only five to ten pounds, and, when asked, responded that he was not sure he could lift a gallon of milk. (*Id.*) Plaintiff testified that he had trouble standing for long periods of time, and needed to sit after 20 to 30 minutes. (AR at 47-48.) He stated that when he got up from sitting to walk, he got a tingling and numbness, and "[t]he nerve pain goes down to my leg, into my foot, my ankle. Sometimes my leg gives out while I get up, and then, while I walk the same thing will happen, and then I'll get sharp pain going right down the leg in the back." (AR at 48.) He stated that he also had difficulty bending and squatting, that he could not kneel, and that he felt discomfort when reaching overhead. (AR at 48-49.)

Impartial vocational expert Edna Clark also testified at the administrative hearing. (AR at 49-56.) The vocational expert identified plaintiff's past work as a correction officer, DOT 372.667-018. (AR at 49.) She testified that this job is usually performed at the medium work level, with an SVP of 4, in the national economy, and found that plaintiff had performed the job at the heavy level. (*Id.*)

The ALJ asked the vocational expert to consider hypothetical individuals of the same age, education, and work experience as plaintiff, with different residual functional capacities. First the ALJ asked her to consider an individual with a light exertional limitation, who could: lift up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit each for approximately six hours per an eight-hour work day, with normal breaks; occasionally climb ladders, ropes, scaffold, stairs, and ramps; and occasionally balance, stoop, kneel, crouch, and crawl. (AR at 49-50.) The vocational expert found that, with these limitations,

plaintiff's past work was eliminated. (AR at 50.) The vocational expert testified that a hypothetical individual with these limitations could, however, perform other jobs in the local, regional, and national economy, such as that of a cafeteria attendant (DOT 311.677-010, light work with an SVP of 2, with 90,000 jobs in the national economy), cashier (DOT 211.162-010, light with an SVP of 2, with 300,000 jobs in the national economy), or final assembler (DOT 789.686-046, light work with an SVP of 2, with 12,000 jobs in the national economy). (AR at 50.) The ALJ next asked the vocational expert to assume the same hypothetical, but this time that the individual had a sedentary exertional limitation, and the vocational expert stated that such a person could perform a job as a surveillance system monitor (DOT 379.367-010, sedentary work with an SVP of 2, with 34,000 jobs in the national economy), a new accounts clerk (DOT 205.367-017, sedentary work with an SVP of 2, with 25,000 jobs in the national economy), or as an order clerk (DOT 209.567-014, sedentary work with an SVP of 2, with 37,000 jobs in the national economy). (AR at 51-52.) Finally, the ALJ noted that there was a medical source statement in plaintiff's file that "doesn't allow eight hours of sitting, standing or walking," and the vocational expert confirmed that limitation would preclude all work. (AR at 53.)

After the ALJ finished questioning the vocational expert, plaintiff's attorney posed questions regarding variations on the ALJ's hypotheticals. First, plaintiff's attorney asked the vocational expert to consider, within the sedentary positions, that the same individual could perform only occasional reaching in all directions and occasional pushing and pulling, and the vocational expert testified that those limitations would eliminate the surveillance system monitor and new account clerk jobs. (AR at 53-54.) Plaintiff's attorney then added to those

limitations that the hypothetical individual needed to have his feet elevated to 90 degrees occasionally throughout the day. (AR at 54.) The vocational expert testified that a person "couldn't do that on a job." (AR at 55.) Plaintiff's attorney next asked about a hypothetical individual with the same limitations as the ALJ posed, but who had to be off-task ten percent of the day, and the vocational expert said such a person "could not perform the job." (AR at 56.)

## II. PROCEDURAL BACKGROUND

### A. Administrative History

On March 20, 2013, plaintiff filed a Title II application for Social Security Disability Insurance Benefits, alleging disability as of July 4, 2012. (AR at 17.) Plaintiff's application for benefits was denied on September 23, 2013, and plaintiff requested a hearing before an ALJ. (Id.) Plaintiff appeared with counsel and testified at a hearing before ALJ Patrick Kilgannon on April 30, 2015, in Central Islip, New York. (Id.) Vocational expert Edna Clark also testified at this hearing. (Id.) On August 8, 2015, ALJ Kilgannon denied plaintiff's disability insurance benefits claim. (AR at 25.) On December 12, 2016, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (AR at 1.)

### B. The Instant Case

Plaintiff commenced this lawsuit on February 3, 2017. (ECF No. 1.) On August 7, 2017, plaintiff moved for judgment on the pleadings. (ECF No. 10.) The Commissioner submitted a cross-motion for judgment on the pleadings on October 20, 2017. (ECF No. 15.) On November 9, 2017, plaintiff responded to the Commissioner's cross-motion for judgment on the pleadings. (ECF No. 16.) On December 1, 2017, the Commissioner filed a reply in further support of her cross-motion for judgment on the

pleadings. (ECF No. 18.) The Court has fully considered the parties' submissions.

### III. STANDARD OF REVIEW

A district court may set aside a determination by the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

### IV. DISCUSSION

#### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Social Security Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims.[6] *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform

---

[6] The ALJ performs this five-step procedure in the first instance; the Appeals Council then reviews the ALJ's decision and determines if it stands as the Commissioner's final decision. *See, e.g.*, *Greek*, 802 F.3d at 374.

her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner must consider the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

## B. The ALJ's Ruling

In the instant case, the ALJ first noted that plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. (AR at 19.) Next, at the first step in the five-step sequential process described *supra*, the ALJ determined that plaintiff had not engaged in substantial gainful activity since July 4, 2012, the date of the alleged onset of his disability. (*Id.*) At step two in the five-step process, the ALJ determined that plaintiff had the following severe impairments: degenerative disc disease and arthritis. (*Id.*) The ALJ noted that plaintiff also "suffers from hypertension, but there is

no evidence the condition causes greater than a de minimis effect on his ability to engage in work related activity." (AR at 20.) The ALJ also noted that plaintiff's hypertension was well controlled with medication, that he did not experience any "debilitating" symptoms, and that the condition was therefore "not severe" for the purposes of this decision. (*Id.*)

At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (*Id.*)

At step four, the ALJ found that plaintiff did not have the residual functional capacity to perform his past relevant work, but had the residual functional capacity to perform light work with certain limitations. (AR at 21, 23.) The ALJ wrote that, after careful consideration of the entire record, he found that: "[plaintiff] has the residual functional capacity to perform light work[7] as defined in 20 C.F.R. [§] 404.1567(b) except that he can only occasionally kneel, bend, climb, balance, and crouch. He can never stoop or crawl. He can only occasionally reach above shoulder level." (AR at 21.)

In reaching this conclusion, the ALJ stated that he followed a two-step process, in which an ALJ first determines whether there is an underlying medically determinable physical or mental impairment. (AR at 21-22.) Second, after finding that an underlying physical or mental impairment that could be reasonably expected to produce plaintiff's

---

[7] Light work is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," as well as work that "requires a good deal of walking or standing . . . or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Further, an individual who can perform light work "can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

pain or other symptoms has been shown, the ALJ is required to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.*) Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the ALJ's consideration of the entire case record. (*Id.*)

The ALJ began his analysis by summarizing plaintiff's testimony at the hearing. (*Id.*) He noted that plaintiff "testified he has constant burning pain and numbness in his neck, back, and extremities . . . [and] has headaches and cannot sleep." (*Id.*) The ALJ also noted that plaintiff cannot sit for more than twenty minutes, lift more than ten pounds, or reach overhead, and that plaintiff lives with his parents, "who help him with chores and care." (*Id.*) On the other hand, the ALJ observed that "at the hearing, [plaintiff] appeared to walk normally and he sat comfortably throughout the hour-long hearing without having to shift positions or get up and walk around. He was not wearing a back brace or a cervical collar. He did not need a cane or crutch." (*Id.*) The ALJ noted that plaintiff "has not attempted to find and hold a job" since the onset of his disability, but plaintiff is capable of driving a car, traveling alone, and caring for his personal needs without assistance. (*Id.*) The ALJ concluded: "[b]ased on these observations and inconsistencies, the undersigned concludes [plaintiff's] testimony concerning his symptoms and limitations is not supported by the evidence of record and is deemed not fully credible." (*Id.*)

Concluding the first step of determining plaintiff's residual functional capacity to work, the ALJ stated that, after he carefully considered all of the evidence, he found that plaintiff's medically determinable impairments "could reasonably be expected to produce the alleged symptoms." (*Id.*) At the second step, however, he found that plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were "not entirely credible." (*Id.*) As stated *supra*, the ALJ determined that plaintiff had the residual functional capacity to perform light work with limitations. The ALJ concluded that "the above residual functional capacity assessment is supported by the medical evidence of record and [plaintiff's] own appearance at the hearing." (AR at 23.)

In support of his determination as to plaintiff's residual functional capacity, the ALJ summarized the opinions of plaintiff's treating physicians and medical experts who assessed plaintiff for the Workers' Compensation Board and Social Security Administration, plaintiff's medical records, and plaintiff's testimony. (AR at 22-23.) The ALJ discussed the opinions of three of plaintiff's treating physicians and three of the medical examiners who evaluated plaintiff's condition. (*Id.*) The ALJ gave the greatest weight to the opinion of Dr. Kwock, one of the medical experts, who found that plaintiff could sit, stand, and walk for seven hours total in an eight-hour workday. (AR at 23.) The ALJ gave some weight to treating physician Dr. Avanesov's opinion, which included that plaintiff sustained "total moderate disability," but noted that he gave "less weight" to Dr. Avanesov's opinion that plaintiff was limited to standing for only an hour "as he walks normally without an assistive device." (*Id.*) The ALJ gave "little weight" to the opinions of treating physician Dr. Alejo and medical examiner Dr. Pollack, and discussed the opinions of Drs. Ruotolo and Weiss without stating how much weight he assigned. (AR at 22-23.)

After concluding his analysis and finding that plaintiff could perform light work with the aforementioned limitations, the ALJ determined that plaintiff was unable to perform past relevant work because his job as a correction officer "required heavy exertional effort." (*Id.*)

Moving to the final step of the five-step process, the ALJ determined that, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (AR at 24.) In determining whether a successful adjustment to other work could be made, the ALJ considered plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. (*Id.*) The ALJ explained that, if plaintiff had the residual functional capacity to perform the full range of light work, the Medical-Vocational Guidelines would direct a finding of "not disabled." (*Id.*) The ALJ had found, however, that plaintiff's ability to perform all or substantially all of the requirements of light work was impeded by additional limitations. (*Id.*) To determine the extent to which plaintiff's aforementioned limitations eroded the unskilled light occupational base, the ALJ had asked the vocational expert whether jobs existed in the national economy for an individual with plaintiff's age, education, work experience, and residual functional capacity. (*Id.*) The ALJ noted in his decision the vocational expert's testimony that, given all of these factors, the individual would be able to perform the requirements of representative occupations such as a cafeteria attendant (DOT 311.677-010, with 90,000 jobs in the national economy), surveillance system monitor (DOT 379.367-010, with 34,000 jobs in the national economy), or final assembler (789.686-046, with 12,000 jobs in

the national economy). (*Id.*) The ALJ stated that he was "persuaded that this is a significant amount of jobs." (*Id.*)

Based on the testimony of the vocational expert, and considering plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (AR at 24-25.) The ALJ found that plaintiff was, therefore, not disabled from the onset of his disability on July 4, 2012 through the date of the ALJ's decision. (*Id.*)

## C. Analysis

Plaintiff challenges the ALJ's decision, finding that plaintiff has not been disabled since July 4, 2012, and denying him disability insurance benefits. Specifically, plaintiff asserts that the ALJ: (1) incorrectly found that his cervical and lumbar spine injuries did not meet the requirements of Listing 1.04A, and (2) failed to properly evaluate the medical evidence. As set forth below, first, the ALJ failed to adequately explain his determination that plaintiff's impairments did not meet the listing requirements. Second, the ALJ failed to properly evaluate the medical evidence. In particular, the ALJ failed to provide good reasons for not crediting plaintiff's treating physicians' opinions and for assigning controlling weight to one of the medical examiners' opinions. Thus, remand is warranted, and the Court need not, and does not, address plaintiff's credibility argument.

### 1. Failure to Meet the Requirements of Listing 1.04A

As discussed *supra*, after the ALJ found that plaintiff had severe impairments, the third step of the five-step procedure for evaluating disability claims required the ALJ to determine if plaintiff's impairments met or medically equaled impairments listed in

Appendix 1 of the regulations. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; *Brown*, 174 F.3d at 62 (citation omitted). If so, the ALJ would find plaintiff disabled. 20 C.F.R. § 404.1520(d). The ALJ determined that plaintiff's severe impairments (degenerative disc disease and arthritis) "d[id] not meet the listing in section 1.04."[8] (AR at 21.)

At this stage in the five-step procedure, an ALJ will find that a claimant has shown his or her impairment matches a listing only if it "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). In order to meet the requirements of a listing, the impairment must "satisf[y] all of the criteria of that listing, including any relevant criteria in the introduction, and meet[] the duration requirement." 20 C.F.R. § 404.1525(c)(3). The duration requirement is that, "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The claimant bears the burden of proving that his or her impairment meets the requirements of a listing. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (explaining that the burden shifts to the Commissioner at step five, after "the claimant satisfies her burden of proving the requirements in the first four steps").

The Second Circuit has stated that courts may uphold an ALJ's determination at step three even in "the absence of an express rationale" where "portions of the ALJ's decision . . . indicate that his conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). The Court finds that the ALJ's decision at this step lacked an express rationale, and that the

remainder of his decision failed to demonstrate that it was supported by substantial evidence.

The ALJ began this step by establishing the Section 1.04 requirements: in order to meet this listing, plaintiff "would have to have demonstrable diagnosis of herniated disc, . . . degenerative disc disease, . . . [or] facet arthritis . . . resulting in a compromise of the nerve root." (AR at 21.) Additionally, "[i]f the allegation relates to a compromise of the nerve root or the spinal cord, nerve root compression must be demonstrated along with neuroanatomic distribution of pain, limitation of motion[,] and motor loss accompanied by sensory or reflex loss." (*Id.*) The ALJ noted that "[a]s this instant claim alleges a lumbar impairment, positive straight leg raising test in the seated and supine position is also required." (*Id.*)

The ALJ then concluded without further analysis that plaintiff's impairments "do[] not satisfy these listing parameters" and that plaintiff, therefore, "does not meet the listing in section 1.04." (*Id.*) The Court not only finds this rationale to be inadequate, but also finds that the record does contain evidence of the listing criteria. As plaintiff points out, the administrative record contains evidence that plaintiff was diagnosed with herniated discs (*e.g.*, AR at 298, 314, 318, 428), degenerative disc disease (*e.g.*, AR at 298, 314, 394), and facet arthritis (*e.g.*, AR at 271, 318). The record also contains evidence of nerve root compression characterized by neuroanatomic distribution of pain (*e.g.*, AR at 264, 270, 454, 479-87), limitation of motion (*e.g.*, AR at 280, 441, 454, 479-87), motor loss accompanied by sensory or reflex loss (*e.g.*, AR at 264, 295, 400), and positive straight

---

[8] The ALJ also found that plaintiff's impairments did not meet the criteria of Section 1.02, but plaintiff

challenges only the determination as to Section 1.04. (ECF No. 10-1 at 17-18.)

leg raise (sitting and supine) (*e.g.*, AR at 362, 365, 394, 441).

The government argues that plaintiff failed to satisfy his burden of showing that his impairments met or equaled the listing criteria. In particular, the government argues that plaintiff failed to meet the duration requirement. The government points to the opinions of Drs. Weiss and Vitaglione that plaintiff's neck strain or sprain was resolving, and that plaintiff had normal reflexes, sensation, and motor strength, by February 2015—"well short of twelve months" after the November 5, 2014 motor vehicle accident that caused this particular condition. (ECF No. 15-1 at 21.) With respect to plaintiff's lumbar condition, the government points to medical records including negative neurological findings by Drs. Weiss, Vitaglione, and Pollack in arguing that the "longitudinal findings were generally normal." (*Id.*)

The government identifies potential weaknesses in plaintiff's case, but plaintiff has also put forward substantial evidence that could support a finding that the listing requirements were satisfied. In addition to the evidence discussed *supra* relating to the severity of plaintiff's impairments, the administrative record includes evidence that plaintiff's impairments satisfied the duration requirement. Dr. Alejo indicated in his April 22, 2015 medical source statement that plaintiff's limitations began in March 2011, and that his impairments have lasted or will last for twelve consecutive months. (AR at 538.) Likewise, Dr. Pollack indicated in her October 5, 2015 medical source statement that plaintiff's impairments have lasted or will last for twelve consecutive months. (AR at 561.)

The ALJ offered no explanation as to why he found plaintiff's impairments failed to satisfy the listing parameters. His conclusory statement does not reference the severity or

duration of plaintiff's impairments, or explain why the medical records containing this evidence fail to satisfy the listing requirements. *See Temkin v. Astrue*, No. 09-CV-4246 JFB, 2011 WL 17523, at *9 (E.D.N.Y. Jan. 4, 2011) (concluding that the ALJ correctly performed step three where he explained that he had considered medical expert opinions, that "no treating or examining physician ha[d] mentioned findings equivalent in severity," and that there was a "complete absence in the record" of evidence supporting plaintiff's claim); *Brown*, 174 F.3d at 65 (reversing an ALJ's decision after finding the determination that plaintiff's condition was not medically equivalent to a listed impairment "[wa]s no longer a reasonable interpretation of the medical evidence in the record"). As other courts in this circuit have correctly found:

> Although it may be the case that the ALJ would ultimately have decided that plaintiff's impairments did not meet or equal the requirements of Listing 1.04A, this possibility does not relieve the ALJ of his obligation to discuss the potential applicability of Listing 1.04A, or at the very least, to provide plaintiff with an explanation of his reasoning as to why plaintiff's impairments did not meet any of the listings.

*Norman v. Astrue*, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012) (citing *Kerr v. Astrue*, No. 09-CV-01119, 2010 WL 3907121, at *6 (N.D.N.Y. Sept. 7, 2010), *report and recommendation adopted*, No. 7:09-CV1119 GLS/VEB, 2010 WL 3893922 (N.D.N.Y. Sept. 30, 2010) (remanding and explaining that "given the above cited evidence, [p]laintiff was owed a more substantive discussion of why she did not meet Listing 1.04A")).

This is not a case where "the rationale for the ALJ's conclusion . . . is clear and is

supported by substantial evidence." *Temkin*, 2011 WL 17523, at *9. The ALJ failed to state his reason for his determination at step three, and the Court is unable to conclude that any of the portions of the ALJ's decision indicate that his conclusion is supported by substantial evidence. The Court, therefore, remands and directs the ALJ to reconsider the evidence in the record of plaintiff's impairments, and provide an explanation as to why it meets or fails to meet the criteria of Section 1.04.

### 2. Failure to Properly Evaluate the Medical Evidence

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole, (iv) whether the opinion is from a specialist, and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Clark*, 143 F.3d at 118. When the ALJ chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for

not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (citation omitted)). A failure by the ALJ to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Here, remand is appropriate because the ALJ failed to give "good reasons" for according less than controlling weight to the opinions of plaintiff's treating physicians, and for according greater weight to one of the medical examiners' opinions. Further, the ALJ appears to have placed significant weight on his own assessment of plaintiff's condition during the hour-long administrative hearing in determining which opinions to credit. As plaintiff correctly argues, the ALJ "dismissed or significantly discounted all of the [treating physicians' opinions] based primarily upon his own layperson review," and reinforced by the opinion of a medical expert who never examined plaintiff. (ECF No. 10-1 at 20.)

First, the Court finds that the ALJ failed to provide sufficient reasons for giving "little weight" to the opinion of Dr. Alejo and only "some" and "less" weight to different portions of the opinion of Dr. Avanesov. Dr. Alejo treated plaintiff for his "persistent and radiating" back pain (as well as shoulder and neck pain) during numerous visits from 2011 through 2015. (*E.g.*, AR at 268, 525.) Dr. Alejo reviewed two of plaintiff's EMG/NCV studies and two of his MRIs, and reported findings including bulging and herniated discs, tears, and lumbar radiculopathy. (*E.g.*, AR at 359, 425, 452, 463.) Based on his review of plaintiff's medical records, in addition to plaintiff's complaints, Dr. Alejo determined on multiple occasions that plaintiff was 100 percent disabled. The government highlights that the ALJ gave Dr. Alejo's opinion little weight because it "contain[ed] no specific limitations," and the plaintiff's residual functional capacity already "accounts for the difficulty reaching and lifting heavy objects." (AR at 23.) The Court is not persuaded that this qualifies as a good reason. Contrary to his statement, the ALJ actually had recognized that Dr. Alejo specified limitations, for instance, by noting that Dr. Alejo found plaintiff "could not sit, stand or walk for even an hour total in an 8-hour day." (*Id.*) Although the ALJ disagreed with Dr. Alejo's determination, as discussed *infra*, the Court finds lack of specificity does not serve as a sufficient reason for discounting Dr. Alejo's opinion. (*Id.*) The ALJ also stated that Dr. Alejo's opinion as to plaintiff's total disability was "contradicted by the rest of the evidence of record."[9] (*Id.*) Based on its independent review of the record, the Court disagrees. In addition to Dr. Alejo, treating physicians Drs. Groth, Avanesov, and Ruotolo all found that

---

[9] The ALJ concluded his discussion of Dr. Alejo's opinion overall by stating that "[i]t appears that Dr. Alejo is attempting to assist [plaintiff] in securing benefits, but his conclusions are not supported by the evidence in the record." (*Id.*)

plaintiff was temporarily totally disabled.[10] (AR at 290-91, 367, 370.)

The ALJ also failed to provide good reasons for according Dr. Avanesov's opinion regarding plaintiff's functional limitations only "some weight." The ALJ noted that Dr. Avanesov found "dynamic activities like lifting, carrying, pushing and pulling should be reduced to a minimum," and "[plaintiff's] general tolerances like walking, sitting and standing are limited to about one hour at a time requiring prolonged rest in between." (AR at 23.) The ALJ distinguished that he gave "less weight" to the limitation to standing for only an hour "as [plaintiff] walks normally without an assistive device" (id.), but did not "articulate good reasons" for according less than controlling weight to the remainder of Dr. Avanesov's opinion. *Perez*, 2009 WL 2496585, at *8. In short, given the lack of good reasons for not crediting the treating physicians' opinions, the Court concludes

that the ALJ's determination failed to satisfy the treating physician rule.[11]

The Court also finds that the ALJ improperly accorded controlling weight to non-examining medical expert Dr. Kwock's opinion.[12] The Second Circuit has indicated that, by extension of the treating physician rule, ALJs should not rely heavily on findings by consultative examiners or non-examining doctors. *Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987) (a "corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis."). In *Selian*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." 708 F.3d at 419. The Court

---

[10] Although the Court highlights these opinions, the Court also notes that they discuss "temporary" total disability and were based on examinations prior to the alleged onset of disability.

[11] The Court also notes that the ALJ barely discussed the opinion of treating physician Dr. Ruotolo, and did not discuss the opinions of treating physicians Drs. Groth and Burducea, thereby omitting evidence that is consistent with Drs. Alejo and Avanesov's opinions. Dr. Groth, for instance, stated that his impression was that plaintiff suffered from lumbar radiculopathy. (AR at 280.) Consistent with a finding of a more severe condition, from April 2011 to July 2011, Dr. Groth administered a series of epidural injections. (AR at 274.) Another example is the doctors' opinions as to plaintiff's total temporary disability, discussed *supra*.

[12] The ALJ also appeared to credit independent medical examiner Dr. Weiss's opinion that plaintiff's injuries were "resolving," and recommending only physical therapy. (AR at 22.) Similarly, the ALJ noted that Dr. Ruotolo did not recommend surgery. (*Id.*) First, the Court notes that Dr. Ruotolo saw plaintiff only days after his January 2011 injury and did not advise against surgery, but, rather, recommended that plaintiff have an MRI taken for

further evaluation. (AR at 370.) He found that plaintiff was "temporarily totally disabled [until] repeat evaluation of [the] MRI." (*Id.*) Second, the Court notes that plaintiff received a series of epidural injections in addition to physical therapy (AR at 274), and was advised on multiple occasions by different doctors to consider surgery (AR at 344, 349, 404, 426, 492). Plaintiff testified that he deferred surgery because he was afraid of the procedure. (AR at 462.)

To the extent the conservative nature of plaintiff's treatment was a key factor the ALJ's conclusion, the Court finds that would be an insufficient basis for finding plaintiff was not disabled in light of the entire record. *See Shaw*, 221 F.3d at 134 (finding that the district court and ALJ erred in "characteriz[ing] the fact that [the treating physician] recommended only conservative [treatment] as substantial evidence that plaintiff was not physically disabled"); SSRs 16–3p (listing factors for ALJs to consider when reviewing an individual's treatment history, including that a plaintiff may not be able to afford more progressive treatment, may not have access to low-cost services, and may not agree to a treatment in light of the side effects).

held that, in doing so, the ALJ "fail[ed] to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.* In *Cruz v. Sullivan*, the Second Circuit explained that "a consulting physician's opinions or report should be given limited weight . . . because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" 912 F.2d 8, 13 (2d Cir. 1990) (citation omitted). Similarly, with regard to non-examining physicians' opinions: "The general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.'" *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) (citation omitted).

As stated *supra*, Dr. Kwock completed an interrogatory to assist with this case based on plaintiff's medical records alone. (AR at 569.) Despite the fact that Dr. Kwock never examined plaintiff, the ALJ gave "great weight" to Dr. Kwock's determination that plaintiff could "sit, stand and walk for up to 4 hours continuously and for 7 hours total in an 8-hour workday," was able to lift and carry up to 20 pounds, and could occasionally kneel and crouch. (AR at 23.) This opinion is at odds with those of the treating physicians, discussed *supra*, who found plaintiff to be much more limited. Given that Dr. Kwock did not examine plaintiff, and the stark contrast between his opinion and those of the treating physicians, the Court finds the ALJ incorrectly assigned controlling weight to this opinion. *Filocomo v. Chater*, 944 F. Supp. 165, 169 n.4 (E.D.N.Y. 1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no

examination are entitled to little if any weight."); *see also Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician." (citations omitted)). Accordingly, the ALJ's "heavy reliance on [Dr. Kwock's] testimony also contravened the clear guidance of SSA regulations, as [Dr. Kwock] was a nonexamining source whose opinions are to be accorded less weight than those of examining sources and especially treating sources." *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 (ENV)(MDG), 2011 WL 1004696, at *4 (E.D.N.Y. Mar. 18, 2011) (citing 20 C.F.R. § 404.1527).

Finally, the Court finds that the ALJ accorded too much weight to his own assessment of plaintiff's condition. An ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Shaw*, 221 F.3d at 134; *see also, e.g.*, *Morgan v. Colvin*, 592 F. App'x 49, 49 (2d Cir. 2015) ("The ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." (quoting *Rosa*, 168 F.3d at 79)). Here, the ALJ included in his ruling that plaintiff "appeared to walk normally," "sat comfortably throughout the hour-long hearing without having to shift positions or get up and walk around," was not wearing a back brace or a cervical collar, and did not need a cane or crutch. (AR at 22.) The ALJ stated that his observations informed his determination that "plaintiff's testimony concerning his symptoms and limitations is not supported by the evidence of record and is deemed not fully credible." (*Id.*) Additionally, these observations served, at least in part, as the basis for the ALJ's conclusion that Dr. Kwock's opinion was entitled to greater weight than the opinions of Drs. Alejo and Avanesov. This is clear from the ALJ's analysis of Dr. Alejo's opinion: he

stated that Dr. Alejo found plaintiff "could not sit, stand or walk for even an hour total in an 8-hour day," and reasoned that "[t]his would require the claimant to lie down for most of the day, which he clearly is not required to do." (AR at 23.) The ALJ appears to have based his finding as to plaintiff's ability to sit for multiple consecutive hours at work daily on the hour-long hearing held to determine if plaintiff would receive benefits. In short, the Court concludes that the ALJ placed too much weight on his own assessment of plaintiff's condition based upon his observation at the hearing in according less weight to the expert opinions of the treating physicians.

In sum, the ALJ failed to provide "good reasons" for declining to accord controlling weight to the treating physicians' opinions. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand."[13] *Selian*, 708 F.3d at 419.

## V. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Commissioner's cross-motion for judgment on the pleadings is also denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: March 30, 2018
Central Islip, New York

***

Plaintiff is represented John W. DeHaan of the DeHaan Law Firm P.C., 300 Rabro Drive East, Suite 101, Hauppauge, New York 11788. The Commissioner is represented by Assistant United States Attorney Megan Jeanette Freismuth of the U.S. Attorney's Office, 610 Federal Plaza, Central Islip, New York 11722.

---

[13] In light of this Court's ruling that the ALJ committed legal error by failing to give "good reasons" for according less than controlling weight to the treating physicians' opinions, the Court need not address plaintiff's other arguments. The Court, therefore, declines to do so, but directs the ALJ on remand to reconsider plaintiff's testimony and credibility after properly applying the treating physician rule. *See McAllister v. Colvin*, 205 F. Supp. 3d 314, 330 n.3 (E.D.N.Y. 2016); *Morris v. Colvin*, No. 15-CV-5600 (JFB), 2016 WL 7235710, at *10 (E.D.N.Y. Dec. 14, 2016).